UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

RUTH A. BROWN,                          )
(Social Security No. XXX-XX-6439),      )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )          3:07-cv-99-WGH-RLY
                                        )
MICHAEL J. ASTRUE,                      )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
                    Defendant.          )


**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge upon the Consents filed by the parties (Docket Nos. 10,

23) and an Order of Reference entered by District Judge Richard L. Young on

March 4, 2009.  (Docket No. 24).


**I.  Statement of the Case**

Plaintiff, Ruth A. Brown, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§

416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this

action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on September 11, 2003, alleging disability since January 15, 2003.[1] (R. 63-65). The agency denied Plaintiff's application both initially and on reconsideration. (R. 33-34, 40). Plaintiff appeared and testified at a hearing before Administrative Law Judge Kathleen Gavin ("ALJ") on December 12, 2005. (R. 546-79). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 546). On January 23, 2006, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past relevant work. (R. 16-25). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 7-9). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on July 24, 2007, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on January 16, 1959, Plaintiff was 47 years old at the time of the ALJ's decision, with an eleventh grade education. (R. 16). Her past relevant work experience included employment as a deli worker, a detailer, a sprayer, a house cleaner, and a waitress. (*Id.*)

---

[1]At Plaintiff's hearing before the ALJ, she admitted that she received unemployment benefits until September 2003. She acknowledged that, in applying for unemployment benefits, she was holding herself out as being able to work.

## B. Medical Evidence

### 1. Headaches and Recurrent Viral Meningitis

On January 10, 2002, until January 19, 2002, Plaintiff was hospitalized at Memorial Hospital in Jasper, Indiana; she was admitted with a potential diagnosis of meningitis. (R. 137-51, 153-62). A lumbar spine MRI scan confirmed the diagnosis but also revealed an adequate spinal canal and no evidence of herniated nucleus pulposus. (R. 137). Additional diagnoses included neck pain, lower extremity pain, history of low back pain secondary to osteoarthritis, and a generalized anxiety order. (*Id.*) Plaintiff was placed on intravenous antibiotics. (*Id.*) Her condition improved significantly and, by discharge, she was in stable condition and needed to be off work for two to three weeks. (*Id.*)

Later in January 2002, Plaintiff saw Peter Kovacs, M.D., for follow-up. (R. 152). She reported occasional spinal pain and occasional headaches. On examination, her neck was supple; her neurological examination was normal, her gait was stable, and there were no objective sensory deficits. (*Id.*) Dr. Kovacs noted that Plaintiff had "made quite a good recovery," and he expected her to return to work within a week or two. (*Id.*)

In April 2004, Plaintiff went to the emergency room for treatment of a migraine headache. (R. 397-98). She told Linda Hanekamp, D.O., that she did not get such headaches very often but, when she did, she usually came to the emergency room for treatment. (R. 397). At that time, Plaintiff denied any

double vision or blurred vision. Plaintiff's headache improved after medication. (*Id.*)

In May 2004, Plaintiff was hospitalized for two days due to aseptic (viral) meningitis. (R. 297-314). In relating her history, Ryan Rolf, M.D., explained that Plaintiff had aseptic meningitis in 2002 with "a full recovery." (R. 297). As part of the testing procedures, Plaintiff underwent bilateral hand x-rays, which were normal. (R. 297, 302-03). Further, the hand x-rays did not show evidence of rheumatoid arthritis type changes, nor did they show significant degenerative joint disease. (*Id.*) A lumbar spine MRI scan revealed some mild neural foraminal encroachment secondary to bulging disc and degenerative facet changes but no evidence of pathologic contrast enhancement, thickening or clumping of nerves. (R. 305). Plaintiff was treated with medication for her meningitis and was released in stable condition to continue her recuperation at home. (R. 297).

At the end of May 2004, Plaintiff returned to the emergency room and saw Monte J. Sellers, D.O., with complaints of headache and leg pain. (R. 396). Plaintiff had just recently been diagnosed with meningitis. She had taken 60 Percocet pills in the prior week. (*Id.*) She was given Dilaudid and Valium in the emergency room and discharged with prescriptions for Ativan and Co-Gesic. (*Id.*) Dr. Sellers reported a discussion with Plaintiff concerning the addictive properties of Percocet and Ativan and noted that he felt she was "at risk for this particular problem." (*Id.*) Dr. Sellers was also concerned that Plaintiff was using

the emergency room for pain management, which was "not the ideal," and that she should be followed by Dr. Tretter instead.  (*Id.*)

Early in June 2004, Plaintiff went to the emergency room with an intractable headache and anxiety.  (R. 315-18).  Her physician, Stan Tretter, M.D., was concerned that the headache was an indication that her meningitis had returned so he admitted her for observation and treatment.  (R. 318).  Dr. Tretter reported that Elavil helped her anxiety.  (R. 315).  Plaintiff reported, after her two-day stay, that her headache had not completely resolved, but it was improved.  (*Id.*)  As follow-up, she saw Dr. Kovacs.  (R. 322-23).  Dr. Kovacs ordered a brain MRI scan and chest x-rays, all of which were essentially normal. (R. 320-21).

Later in June 2004, Plaintiff returned to the emergency room with complaints of a headache and nausea.  (R. 385-90).  She was diagnosed with a migraine headache and given Phenergan and Dilaudid.  (R. 387).  Her pain reduced from a level ten to five after medication.  (*Id.*)  She was discharged in stable condition and advised to follow up with Dr. Tretter.  (*Id.*)

In July 2004, Plaintiff saw Dr. Tretter with complaints of headaches.  (R. 438-39).  He refilled her Lortab, which had been effective in the past.  (R. 439). Dr. Tretter noted that Plaintiff was scheduled to see a neurologist.  (*Id.*)

In August 2004, Dr. Kovacs reviewed the test results and explained that, neurologically, Plaintiff was asymptomatic.  (R. 319).  However, Dr. Kovacs also noted that Plaintiff had unequal pupils due to chronic iritis.  He also believed

that it was possible that Plaintiff had sarcoidosis which was the source of her rheumatoid features, elevated sedimentation rate, and elevated ACE levels. (*Id.*)

In November 2005, Plaintiff went to the emergency room with complaints of a headache. (R. 461). She explained that this headache was similar to the one that proceeded her meningitis, so the hospital did a spinal tap. (R. 461-63). The results were negative, and she was discharged home in stable condition after receiving medication. (R. 465, 467).

In summary, Dr. Kovacs and Gary Keepes, M.D. (in January 2002) and Dr. Rolf (in May 2004) found that Plaintiff needed hospitalization for treatment of meningitis which caused Plaintiff to have headaches. (R. 161, 141, 323). There are also numerous times when her headaches are discussed when the headaches do not appear to be caused by meningitis but are rather diagnosed as migraines, etc. (R. 139, 177, 203, 222, 225, 232, 235, 238, 385, 387, 393, 396, 397, 432, 438, 441, 461, 526, 561).

### 2. Vision Problems

The Social Security Administration had Plaintiff examined by Kipp Beard, M.D., on October 28, 2003. Dr. Beard stated "[t]he right pupil is irregular in shape and offset, roll inferiorly and seems poorly reactive to light." (R. 252).

Her visual acuity was 20/100 in the right eye and 20/25 in the left eye without corrective lenses. (*Id.*) Dr. Beard noted "some mild limitation" of seeing in the right eye. (R. 255). The Neurologic Follow-Up Note from Memorial Hospital on July 19, 2004, notes that "her pupils were unequal as before from

chronic iritis on the right side."[2]  (R. 322).  In November 2004, Plaintiff saw

Duane Flannagan, M.D., for an eye examination after she was hit in the eye.  (R.

333).  Her eye exam on November 12, 2004, notes that she was photophobic and

had blurred vision for a few years.  (*Id.*)  That physician found that she had iris

atrophy along with inferior pupil margin.  (R. 334).  These vision problems make

it difficult for Plaintiff to read.  (R. 551).  She has problems with, for example,

reading food preparation directions when trying to cook.  Dr. Flannagan

diagnosed iritis.  (R. 333).  He prescribed eye drops.  (R. 334).

In August 2005, Plaintiff returned to Dr. Tretter with complaints of

dizziness and ringing in her ears.  (R. 416-17).  She reported no vision

complaints.  (R. 416).  Dr. Tretter prescribed medication for her serous otitis,

however.  (R. 417).  On examination, she weighed 206 pounds.  (*Id.*)  She

reported that her pain level was a zero on a scale of one to ten.  (*Id.*)

### 3. Sleep Apnea and Sleepiness Caused from Medicines

In February 2003, Plaintiff underwent a CT scan of her sinuses, which was

normal.  (R. 200).  She had a polysomnography performed on February 21, 2003.

Mark G. Goetting, M.D., Diplomate, American Board of Sleep Medicine and

Medical Director of the Sleep Disorders Clinic, conducted the test.  (R. 198-99,

294-96).  His impression was that she suffered from obstructive sleep

---

[2]Iritis is an inflamation of the iris.  Chronic iritis can last for years and is accompanied by a higher risk of visual impairment.  Some of the symptoms include photophobia and blurred or cloudy vision.  *Definition for Iritis*, *available at* http://www.medgle.nl/rw/diagnoses/iritis (last updated May 25, 2008).

apnea-hypopnea syndrome, moderate, with mild hypoxemia.  (R. 199).  Dr. Goetting recommended a trial of nasal CPAP therapy.

Plaintiff also testified in her hearing that her medicines do make her sleepy.  (R. 565).  For example, she has been taking Lortab (R. 335, 373), Dilaudid (R. 383), Percocet (R. 396), and Phenergan (R. 424).

### 4. Back Pain, Leg Pain, and Fibromyalgia

Plaintiff has a long history of back and neck pain.  (R. 190, 247, 249, 296, 345, 419, 432, 448).  X-rays from St. Joseph's Hospital dated October 11, 2003, show that Plaintiff suffers from a reversal of the normal cervical lordosis with slight anterior subluxation from C2-3 through C4-5.  (R. 493).  At times the back pain was diagnosed as "intractable cephalagia" (R. 143), but at other times Dr. Tretter thought that the pain was caused by her recurrent kidney stones (R. 340).  In addition, her physicians feel that part of her back pain is due to the recurrent viral meningitis which was previously discussed.  (R. 137, 297).

In October 2003, Plaintiff saw Dr. Beard, at the request of the state agency.  (R. 250-56).  On range of motion examination, Plaintiff had normal results except for a reduced range of knee motion (she had 130 degrees compared to a normal 150 degrees).  (R. 256).  The rest of her examination was also normal, except for some tenderness in her fingers.  (R. 253-54).  She was able to write with her dominant hand and pick up coins with either hand without difficulty.  (R. 254).  Muscle strength was normal.  (*Id.*)  Deep tendon reflexes were equal and positive.  (*Id.*)  She was able to walk on her heels and

toes and able to walk heel-to-toe and squat, albeit with knee pain. (*Id.*) Dr. Beard also felt that Plaintiff suffered from left shoulder subacromial bursitis. (R. 255). Dr. Beard noted that Plaintiff had no difficulty negotiating in the office. (*Id.*) Dr. Beard opined that Plaintiff retained the ability to sit, stand, walk, and handle objects. (*Id.*) He noted that there would be "probably" some limitation in her ability to repetitively lift and carry. (*Id.*)

In September 2004, Plaintiff returned to Dr. Tretter with complaints of lower leg pain. (R. 431-33). She explained that she had taken all of her pain medications because she had recently helped move her mother home from her nursing home. (R. 431). At the time, Plaintiff cared for both her mother and father at home. (*Id.*) She explained that she had taken a medication (which Dr. Tretter thought was Oxycontin) that was prescribed for one of her relatives. (*Id.*) Dr. Tretter was "concerned." (*Id.*) Dr. Tretter refused to prescribe narcotic medications other than her normal medications, noting that Ms. Brown "was too early for a refill." (R. 432). He advised her not to take medications prescribed for others, particularly such a strong medication as Oxycontin 60 mg. (*Id.*) Dr. Tretter diagnosed sciatica as a source of her leg pain and also opined that her migraine headaches were stress-related. (*Id.*)

In February 2005, Plaintiff underwent a lumbar spine MRI scan. (R. 375-76). There was no evidence of focal disc herniation or canal stenosis. (R. 375). Mild diffuse disc bulging was seen at L4-5, resulting in "minimal to mild" narrowing at a left neural foramina. (*Id.*)

In March 2005, Plaintiff underwent a nerve conduction study and needle electrode examination of her right leg. (R. 411-14). Both were normal. (R. 411).

In May 2005, Plaintiff underwent chest x-rays after she complained of shortness of breath and cough. (R. 381, 418-21). The x-rays were negative for acute pulmonary findings. (R. 381). Dr. Tretter also noted that Plaintiff had elevated blood pressure, which was "a new finding." (R. 419).

In June 2005, Plaintiff saw Tammy Ziegler, R.N., C.N.P., at the Pain Management Center. (R. 403-05). Plaintiff reported pain "everywhere." (R. 404). Her current medication list included Tylenol, Lortab, Cymbalta, and Nexium. (*Id.*) On examination, she weighed 210 pounds. (R. 405). Deep tendon reflexes were positive and equal. (*Id.*) There was no numbness or tremor noted. (*Id.*) Plaintiff displayed paravertebral tenderness in her thoracic spine and pinpoint pain with palpation at her right S1 area. (*Id.*) There were no muscle spasms. (*Id.*) She was able to flex without difficulty. (*Id.*) Patrick's sign was negative, and a straight leg raise test was negative. (*Id.*) The nurse assessed sacroiliac pain; myofascial pain; multiple joint arthritis; and right leg pain. (*Id.*) The nurse sent for the records from Dr. Tretter. (*Id.*) Plaintiff signed a narcotic agreement that she was not dosing her own medications and not receiving narcotics from anywhere else, including the emergency room or dentist. (*Id.*)

In July 2005, Plaintiff saw Rickey Kinzey, D.O., at the Pain Management Center. (R. 402). Examination revealed marked tenderness and some trigger

point sensitivity. (*Id.*) Dr. Kinzey's impression was generalized pain and fibromyalgia. (*Id.*)

Dr. Tretter prescribed medication for hypertension. (R. 417). He noted that Plaintiff was "doing better" on Wellbutrin for her depression with anxiety. (*Id.*) As for fibromyalgia, Dr. Tretter noted that Plaintiff was continuing with the Pain Management Clinic. (*Id.*)

In November 2005, David Johnson, M.D., at the Pain Center issued an opinion of Plaintiff's work-related functions. (R. 474-81). Dr. Johnson noted Plaintiff had a marked difficulty in arising out of her chair and required both hands. (R. 474). Dr. Johnson also found a right leg limp, a decreased range of motion in Plaintiff's left shoulder, and severely decreased grip strength in both hands. (*Id.*)

Dr. Johnson went through an exhaustive review of Plaintiff's medical history. (R. 475-76). Dr. Johnson opined that Plaintiff could occasionally and frequently lift less than ten pounds. (R. 475, 478). She could stand or walk less than two hours in an eight-hour workday. (R. 476, 478). She could sit for less than six hours in an eight-hour workday. (R. 476, 479). She must lie down from 45 to 60 minutes four to five times a day. (R. 476). These breaks would be unscheduled and varied with the severity of her low back discomfort. (*Id.*) Pushing and pulling was limited. (*Id.*) Fingering and fine manipulation was decreased. (*Id.*) Gross handling and manipulation was also decreased, with left

worse than the right.  (*Id*.)  Her visual and communicative abilities were limited by her chronic iritis.  (*Id*.)  She should avoid machinery and heights.  (*Id*.)

### 5.  Shoulder Pain

In September 2003, Jeannie Gruber, M.D., the Plaintiff's family doctor, had given Plaintiff injections in her left shoulder for rotator cuff tendonitis.  (R. 183).  The injections were given because of severe left shoulder pain.  (R. 186).  Dr. Gruber noted that Plaintiff had complaints of pain "almost everywhere" in her body, including her hands, knees, back, and head.  (R. 183).  Plaintiff requested a prescription for Lortab.  (*Id*.)  Dr. Gruber explained that she would not prescribe Lortab on a chronic basis and recommended a pain clinic.  (*Id*.)  Dr. Gruber noted that Plaintiff had displayed some drug-seeking behavior in the past and noted that it was difficult to know when she had "true pain."  (*Id*.)

In June 2004, Plaintiff returned to Dr. Tretter.  (R. 440-42).  On physical examination, she was 220 pounds.  (R. 441).  There were no gross motor or sensory deficits.  (*Id*.)  She had limited range of motion, primarily in the left shoulder and right forearm.  (*Id*.)  Dr. Tretter opined that Plaintiff could perform activities "as tolerated."  (*Id*.)   In September and October 2004, Plaintiff received left shoulder injections.  (R. 446-49).  On October 31, 2005, Dr. Kinzey's exam revealed marked tenderness in the cervical region; Dr. Kinzey administered a shoulder injection to Plaintiff and diagnosed her shoulder problems as osteoarthritis.  (R. 446).

### 6. Hand Impairments

In March 2004, Plaintiff was examined by Dr. Tretter. (R. 282-83). On examination, her weight was 207 pounds. (R. 282). She had "some" swelling of the small joints in her hands but no nodules or deformities were appreciated. (R. 283). Her peripheral pulses were palpable and symmetrical. (*Id.*) Plaintiff also had limited range of motion. On March 19, 2004, Dr. Tretter opined that Plaintiff had a functional limitation on her hand activity, particularly with fine motor skills. (R. 281). He explained that he based his opinion on one office visit in the prior two years. (*Id.*)

In October 2004, Plaintiff saw Walter L. Norton, M.D., at the request of Dr. Tretter. (R. 324-32). She felt she had rheumatoid arthritis, but tests indicated otherwise. (R. 324, 327). On examination, Plaintiff was about 62 inches tall and weighed 208 pounds. (R. 324). Her right hand was diffusely "puffy" with tenderness of the finger joints. (R. 324).

The arthritis pain is noted multiple times in her medical records. (R. 197, 215, 233, 405, 432, 437, 441). A laboratory test did show an elevated sedimentation rate that confirmed the presence of arthritis. (R. 319).

Twenty months after he had originally opined about Plaintiff's hands, in November 2005, Dr. Tretter again opined that Plaintiff was unable to perform activities requiring repetitive use of her hands. (R. 454). She could not lift more than five pounds or do any bending. (*Id.*) She needed several unscheduled rest periods throughout the day due to pain and stiffness with sitting or standing for

more than 30 minutes at a time. (*Id.*) Increases in pain increased her level of anxiety, resulting in difficulty staying on task and completing work assignments. (*Id.*)

### 7. Mental Impairments

In November 2003, Plaintiff saw Joy L. Baker, Ph.D., at the request of the state agency. (R. 257-62). She reported that she could care for her personal needs. (R. 258). She did her daily routine of cleaning, doing the dishes, laundry, and cooking. (*Id.*) She reported good relationships with her mother and being particularly close to one of her sisters. (R. 258-59). Plaintiff had a "couple of real good friends" that she saw once every week or two. (R. 259). On mental status examination, Plaintiff appeared agitated and sad. (*Id.*) Her speech was clear, logical, and goal-directed. (R. 260). She had some difficulty with memory, and Dr. Baker noted that it was difficult to tell if Plaintiff's memory lapses were due to stress, depression, or even her meningitis. (R. 262). Dr. Baker opined that Plaintiff would have difficulty concentrating on instructions and remembering what she was supposed to do. (*Id.*) Dr. Baker noted that Plaintiff had a low energy level. (*Id.*) Dr. Baker opined that she would respond to pressure with anxiety. (*Id.*) Dr. Baker's diagnosis was major depressive disorder with feelings of worthlessness, fatigue, a diminished ability to attend and concentrate, crying spells, and hyperinsomnia. (R. 261). She also diagnosed generalized anxiety disorder, which involved excessive anxiety and worry occurring more days than not, involved a person finding it difficult to control the worry, and involved

anxiety and worry that is associated with the mind going blank, muscle tension, difficulty falling asleep, and irritability. She was given a global assessment of functioning ("GAF") score of 50.[3] (*Id.*)

In December 2003, K. Neville, Ph.D., reviewed Plaintiff's records for the state agency. (R. 118-27). In considering the "B" criteria of the Listing of Impairments ("listings"), Dr. Neville opined that Plaintiff had only mild restrictions of activities of daily living and in maintaining social functioning. (R. 125). She had moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*) She had experienced no episodes of decompensation. (*Id.*) As for an RFC, Dr. Neville opined that Plaintiff retained the ability to understand and remember locations, work-like procedures, and very short and simple instructions. (R. 118). She was not significantly limited in her ability to concentrate and persist at tasks except that she was moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (*Id.*) She was not significantly limited in her ability for social interaction. (R. 119). She was not significantly limited in her ability to adapt, except that she was moderately limited in her ability to set realistic goals or make plans independently of others. (*Id.*)

In June 2004, J. Pressner, Ph.D., reviewed the records and affirmed Dr. Neville's opinion. (R. 120).

---

[3]A GAF score of 41-50 signifies serious symptoms, or any serious impairment in social, occupational, or school functioning.

In February 2004, Plaintiff saw Robert Moskos, a social worker, for an intake interview. (R. 278-80). Most of the evaluation concerned Plaintiff's physical complaints. (R. 279). She reported that she often became tearful, withdrawn, and reported a lack of concentration and an increase in sleep. (*Id.*) After one more session, Moskos completed a psychiatric status report, which was counter-signed by David Gray, M.D., although he did not appear to have actually seen Plaintiff. (R. 272-77). Moskos noted that Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depression. (R. 272). Her stressors included occupational and economic problems. (*Id.*) Moskos noted that Plaintiff was cooperative, dramatic, and pleading. (R. 273). Her speech was relevant and coherent. (*Id.*) She was easily distracted. (*Id.*) The example given was that Plaintiff, who was hot in her sweater, started to take it off and then remembered that she was not wearing another shirt underneath. (*Id.*) Moskos noted that Plaintiff drove herself to the appointment. (*Id.*) On mental status examination, Plaintiff was able to do simple math problems, serial sevens, define differences and similarities, and answer judgment questions. (R. 275). She reported that she had no problems getting along with others. (R. 276). Her self-reported functional limitations revolved around her physical problems, except that she reported feeling "grouchier" than normal. (*Id.*) Plaintiff voluntarily withdrew from counseling in June 2004. (R. 409-10). Dr. Gray/Moskos also found that Plaintiff had a GAF of 50. (R. 272).

In September 2005, Plaintiff saw Vanessa Froehlich, a social worker. (R. 406-08). Plaintiff reported that she was depressed "all the time." (R. 406).

In November 2005, Plaintiff saw Dr. Gray. (R. 456-58). She explained that she was "in pain all the time" and that her depression started three years earlier when she was diagnosed with fibromyalgia. (R. 456). Plaintiff reported frustration at being denied Social Security benefits. (R. 457). On mental status examination, she was tearful and she described her mood as "miserable." (*Id.*) Her thought process was spontaneous, coherent, and goal-directed. (*Id.*) She complained of difficulty with memory, but it was not evident during the evaluation. (*Id.*) Remote and recent memory were generally intact. (*Id.*) Dr. Gray noted that, based on her subjective narrative, he diagnosed pain disorder with associated medical condition and psychological features. (*Id.*) Dr. Gray prescribed medication and encouraged Plaintiff to continue counseling with Ms. Froehlich. (R. 458). He assessed Plaintiff's GAF score as a 60.[4]

Plaintiff's physicians have tried her on numerous medicines (R. 116, 203, 166, 205-06) including Paxil, Wellbutrin, Klonopin (R. 515), Lexapro (*id.*), and Cymbalta (R. 417). At times her physicians have given her a diagnosis such as depression with anxiety (*id.*) or generalized anxiety (R. 420).

---

[4]A GAF score of 51-60 identifies moderate symptoms or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th edition).

### 8. Plaintiff's Other Medical Conditions

In December 2004, Plaintiff went to the emergency room with complaints of right upper quadrant pain, which was determined to be caused by a small kidney stone. (R. 338-50). Dr. Tretter felt the stone would pass in time, and Plaintiff was discharged with oral pain medications and instructions to continue to drink plenty of fluids. (R. 338).

In January 2005, Plaintiff went to the emergency room with complaints of left lower quadrant pain. (R. 351-72). Dr. Tretter explained that test results noted no structural component, and he felt her pain was more likely due to a functional bowel syndrome. (R. 351, 422). He started her on Bentyl, weaned her off her pain medications (given for the kidney stone in December 2004), and "advanced" her diet. (R. 351). She was able to eat and drink a regular diet and was "up and ambulating." (*Id.*) He discharged Plaintiff in stable condition. (R. 352).

### 9. State Agency Review

In December 2003, T. Crawford, M.D., reviewed Plaintiff's records for the state agency. (R. 129-36). Dr. Crawford opined that Plaintiff retained the ability to perform light work. (R. 130). However, she should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs. (R. 131). She needed to avoid even moderate exposure to hazards, such as machinery and heights. (R. 133). Dr. Crawford's opinion was affirmed by R. Wenzler, M.D., in April 2004. (R. 136).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in

order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.

The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a

severe impairment or combination of impairments; (3) has an impairment that

meets or equals an impairment listed in the regulations as being so severe as to

preclude substantial gainful activity; (4) is unable to perform his past relevant

work; and (5) is unable to perform any other work existing in significant numbers

in the national economy.  *Id.*  The burden of proof is on Plaintiff during Steps 1

through 4, and only after Plaintiff has reached Step 5 does the burden shift to the

Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of

the ALJ's decision.  Plaintiff also had not engaged in substantial gainful activity

since the alleged onset date. (R. 24).  The ALJ found that, in accordance with 20

C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe:

(1) fibromyalgia; (2) obesity; and (3) degenerative disc disease of the lumbar spine.

(*Id.*)  The ALJ concluded that these impairments did not meet or substantially

equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her

limitations were not fully credible. (R. 25).  Consequently, the ALJ concluded

that Plaintiff retained the RFC for light work with a sit/stand option; only

occasional climbing of stairs; no climbing of ladders, ropes, or scaffolds, and no

work around unprotected heights or dangerous machinery.  (*Id.*)  The ALJ opined

that Plaintiff retained the RFC to perform her past work. (*Id.*) The ALJ concluded by finding that Plaintiff was not under a disability. (*Id.*)

## VI. Issues

The ALJ in this case was faced with a most difficult task. Plaintiff's limitations arise from the effects of pain from a variety of possible sources (including a diagnosis of fibromyalgia), and the often intertwined effects which obesity and arthritis can impose upon ability to function. These conditions are all highly subjective. There really are no objective medical tests available to the physicians – or to the ALJ – to help draw definitive lines which separate those who, impaired by these conditions, can engage in employment from those who cannot. The legal regulations and standards offer no better bright line to guide the adjudicator. As quoted on the pages to follow, the legal guidelines are long, cumbersome, and difficult to implement.

The ALJ has articulated her attempts to draw the lines in a reasonable and professional manner in her decision. (R. 16-25). Applying the standard that this court may not re-weigh the evidence or substitute our judgment as to disability for that of the Commissioner, we will now attempt to add our best effort to that of the ALJ in evaluating whether Ms. Brown is entitled to disability benefits.

The Commissioner examined Plaintiff's brief and concluded that Plaintiff essentially raised six issues. (Defendant's Memorandum in Support of Commissioner's Decision at 2). The court notes two additional issues which we believe Plaintiff also raised in her brief. The issues are as follows:

1. Whether the ALJ's failure to find that some of Plaintiff's impairments were severe was an error.

2. Whether the ALJ erred in evaluating Plaintiff's obesity.

3. Whether the ALJ failed to properly consider Plaintiff's fibromyalgia diagnosis.

4. Whether the ALJ neglected testimony concerning Plaintiff's vision, crying spells, and inability to drive.

5. Whether the ALJ's credibility determination concerning the effects of Plaintiff's pain was patently wrong.

6. Whether the ALJ failed to consider the combined effects of Plaintiff's impairments.

7. Whether the ALJ failed to give proper weight to the opinions of Dr. Tretter.

8. Whether Plaintiff could perform her past relevant work.

**Issue 1:     Whether the ALJ's failure to find that some of Plaintiff's impairments were severe was an error.**

Plaintiff first argues that the ALJ was in error by failing to find some of Plaintiff's impairments severe, particularly Plaintiff's depression, headaches, recurrent meningitis, and iritis.  The court also notes that an argument can be made that Plaintiff's shoulder impairment and hand impairment were both severe impairments as well.  As discussed above, 20 C.F.R. § 404.1520 provides a five-step evaluation process.  Step 2 of that process involves determining if an individual has a severe impairment.  Step 2 is simply an initial screening device

to eliminate consideration of individuals who have only slight impairments. *Taylor v. Schweiker,* 739 F.2d 1240, 1243 n.2 (7th Cir. 1984). While an ALJ's failure to label a particular impairment as "severe" is technically an error of law, such an error is not reversible as long as the ALJ finds other severe impairments and continues with the five-step evaluation process. See *Perez v. Barnhart,* 2003 WL 22287386 at *9 (N.D.Ill. 2003)(citing *Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir. 1987)).

In this case, the ALJ found that Plaintiff had three severe impairments, and she proceeded to Steps 3 and 4 to examine whether Plaintiff's impairments met any of the listings and whether Plaintiff could still perform her past work. Hence, while the ALJ's failure to find some of Plaintiff's impairments to be severe may have been error, this alone would not warrant remand.

**Issue 2: Whether the ALJ erred in evaluating Plaintiff's obesity.**

Plaintiff also argues that the ALJ failed to properly address her obesity. In 1999, the Social Security Administration removed obesity from the Listing of Impairments that are automatically disabling. However, Social Security Ruling 02-1p provides that an ALJ must still evaluate an individual's obesity.

SSR 02-1p provides, in pertinent part, that an ALJ must examine the effects of obesity, together with all other impairments, to determine: (1) if an individual has a severe impairment at Step 2 of the five-step sequential evaluation process; (2) if that impairment meets or equals a listing at Step 3; and (3) whether an individual can perform past work or any work in the regional

economy at Steps 4 and 5.  SSR 02-1p.[5]  Yet, the failure to explicitly consider the

effects of obesity may be harmless error.  *Prochaska v. Barnhart,* 454 F.3d 731,

736-37 (7th Cir. 2006).  If an ALJ fails to address an individual's obesity, but

adopts the limitations suggested by the specialists and reviewing doctors who

were aware of the obesity, then the ALJ's error is harmless.  *Id.*

Here, the ALJ did specifically find Plaintiff's obesity to be a severe

impairment.  (R. 23, 25).  She did, therefore, comply with SSR 02-1p, at least in

part.  Did the ALJ consider Plaintiff's obesity in determining if Plaintiff met some

other listing?  The regulations applicable to this issue state as follows:

**Sequential Evaluation**
**Step 3, The Listings**

7.    How Do We Evaluate Obesity at Step 3 of Sequential Evaluation, the
       Listings?

       Obesity may be a factor in both "meets" and "equals"
       determinations.

       Because there is no listing for obesity, we will find that an
       individual with obesity "meets" the requirements of a listing if
       he or she has another impairment that, by itself, meets the
       requirements of a listing.  We will also find that a listing is met
       if there is an impairment that, in combination with obesity,
       meets the requirements of a listing.  For example, obesity may
       increase the severity of coexisting or related impairments to the
       extent that the combination of impairments meets the
       requirements of a listing.  This is especially true of
       musculoskeletal, respiratory, and cardiovascular impairments.
       It may also be true for other coexisting or related impairments,
       including mental disorders.

---

[5]Because SSR 02-1p is 9 pages in length, it has not been set out in its entirety
in this opinion.

*****

> We may also find that obesity, by itself, is medically equivalent
> to a listed impairment . . . .  For example, if the obesity is of
> such a level that it results in an inability to ambulate
> effectively, as defined in sections 1.00B2b or 101.00B2b of the
> listings, it may substitute for the major dysfunction of a joint(s)
> due to any cause (and its associated criteria), with the
> involvement of one major peripheral weight-bearing joint in
> listings 1.02A or 101.02A, and we will then make a finding of
> medical equivalence.

(SSR 02-1p).  In examining Plaintiff's impairments in this case, the ALJ never explicitly mentions SSR 02-1p, nor does the ALJ provide a detailed analysis of Plaintiff's obesity in relation to any listed impairment.  This court notes that SSR 02-1p specifically mentions three impairments which are often affected by obesity for which Plaintiff has been diagnosed:  sleep apnea, arthritis, and depression. The record in this case contains a number of doctors' findings that were pertinent to Plaintiff's obesity including:  (1) the opinions of Robert Moskos who said Plaintiff was easily distracted (which could have been caused by Plaintiff's sleep apnea or depression) (R. 273); (2) Dr. Baker's diagnosis of major depressive disorder with feelings of worthlessness, fatigue, and a diminished ability to attend and concentrate (R. 261); (3) Dr. Tretter's opinion that Plaintiff needed several unscheduled rest periods throughout the day due to pain and stiffness with sitting or standing for more than 30 minutes at a time (R. 454); (4) Dr. Tretter's opinion that Plaintiff's pain would cause difficulty staying on task and completing work assignments (*Id.*); (5) Dr. Johnson's opinion that Plaintiff could stand or walk less than two hours in an eight-hour workday and must lie down from 45 to

60 minutes four to five times a day (R. 476, 478); and (6) Dr. Goetting's impression that Plaintiff suffered from obstructive sleep apnea-hypopnea syndrome (R. 199).

These findings notwithstanding, Plaintiff's brief does not point us to any specific listing which the ALJ should have mentioned or considered in her analysis. Our own review of the listings suggests that Listing 1.02 – Major Dysfunction of a Joint, 1.04 – Disorders of the Spine, and 12.04 – Affective Disorders are three listings that perhaps should have been considered by the ALJ to determine if Plaintiff's obesity created the functional equivalent of a listing.

### A. Listing 1.04 – Disorders of the Spine

Here, the ALJ found that the "severe" impairment of "degenerative disc disease" is present, and at least one MRI and x-rays have been taken to ascertain the extent of the condition. (R. 375, 493). While these tests found that Plaintiff has a reversal of her normal cervical lordosis (R. 493) and mild diffuse disc bulging (R. 375), there is no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. There are no doctor's reports establishing any physiological conditions of the back that would limit function. Dr. Beard found normal gait and only some limitation to repetitive lifting and carrying. (R. 255). He stated that Plaintiff's examination revealed "well preserved motion, but associated with pain and there was no finding of radiculopathy or myelopathy today. [Plaintiff's] gait is slow in pace but otherwise normal in appearance without ambulatory aids." (*Id.*) An MRI of the spine showed no

evidence of focal disc herniation and some "mild diffuse disc bulging" at L4-L5. (R. 375). Dr. Johnson did examine Plaintiff and found limitation of motion (R. 475) which limited her – in Dr. Johnson's opinion – to standing for less than two hours and sitting for less than six hours in a normal workday.

Dr. Johnson and Dr. Beard, therefore, came to different conclusions about Plaintiff's back. Dr. Beard's report can be accepted as substantial evidence to support the ALJ's conclusion that Plaintiff's obesity does not pose functional limitations equivalent to Listing 1.04.

**B. Listing 1.02 – Major Dysfunction of a Joint**

Listing 1.02 is satisfied when there is a major dysfunction of a joint in either one major peripheral weight-bearing joint, or the involvement of one major joint in each upper extremity which results in an inability to perform fine and gross movements effectively as defined in Listing 1.00B2c. The inability to perform fine and gross movements is described in Listing 1.00B2c as follows:

> c. What we mean by inability to perform fine and gross movements effectively. Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Part 404, Subpart P, Appendix 1.

The court's review of the medical evidence discloses only one piece of medical evidence that supports an extreme loss of function in either one peripheral weight-bearing joint or the involvement of one major joint of each upper extremity. Dr. Johnson's report (R. 474-81) does indicate that Plaintiff has decreased grip strength in both hands, and a left shoulder range of motion that is "extremely decreased in the ability to forward elevate." (R. 474). He found that Plaintiff's manipulative limitations would be very limited in reaching in all directions, and "gross handling and manipulation would be decreased due to the lack of grip strength bilaterally with left being worse than right." (R. 476).

Dr. Johnson's findings would appear to bring Listing 1.02 into consideration. However, the ALJ clearly articulated that she was giving no weight to Dr. Johnson's opinion because he conducted his examination at the request of claimant's attorney,[6] and because his findings were "not supported by other physicians who examined and treated [Plaintiff] . . . ." (R. 21).

This court's review of the other medical evidence of record on the issue of Plaintiff's inability to use both of her upper extremities supports the ALJ's conclusion that Dr. Johnson's opinions were unsupported by other medical practitioners. Dr. Beard found some decreased grip strength and that was only with respect to Plaintiff's right hand. (R. 253). His restrictions included only "some limitations to repetitive lifting and carrying." (R. 255).

_____

[6]This court is unaware of any regulation which requires or allows an ALJ to discount a physician's opinion simply because the examination was arranged by Plaintiff's counsel. This purported rationale has been disregarded by the court.

Dr. Tretter's examination in March 2004 did find "swelling of the small joints of her hands and wrists, as well as a limited range of motion and tenderness on palpation." (R. 281). Dr. Tretter believed these findings indicated a "functional limitation that she can perform with her hands, particularly fine motor skills." (*Id.*) However, Dr. Tretter did indicate that his findings were based on only one visit with Plaintiff in two years. By June 2004, Dr. Tretter found no gross motor or sensory deficits, and only some limited range of motion – primarily in the left shoulder and right forearm. (R. 441). Dr. Tretter did not impose any restrictions on Plaintiff's activities at that time. Follow-up visits in June, July, and August reflect complaints of pain in the right arm and left shoulder, but at best these problems are described as "pain with range of motion"; no specific restrictions are given except to say "Activity/Restrictions: As tolerated." (R. 437).

Given these findings, the court concludes that substantial evidence does support the ALJ's conclusion that Plaintiff's obesity does not result in the equivalent functional limitations found in Listing 1.02.

### C.  Listing 12.04 – Affective Disorders

In order for Plaintiff's obesity to have rendered Plaintiff functionally equivalent to Listing 12.04, the ALJ must have considered the reports of Joy Baker, Ph.D. (R. 257-62), state agency reviewer K. Neville, Ph.D. (R. 119-27), the February 2004 report of Dr. Gray and social worker Robert Moskos (R. 272-90), and the November 2005 report of Dr. Gray  (R. 456-58).

For the ALJ to find that Plaintiff's obesity impacted her mental health to the degree that she met this listing, Plaintiff must provide evidence of

A.  Medically documented persistence, either continuous or intermittent, of . . .

1.  Depressive syndrome characterized by . . :

c.  Sleep disturbance; or

* * * * *

e.  Decreased energy; or

f.  Feelings of guilt or worthlessness; or

g.  Difficulty concentrating or thinking . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1.

In this case, the reports of all of the examining physicians, including Dr. Baker (R. 257-62), Robert Moskos/Dr. Gray (R. 272-80), and Dr. Gray's report at a later examination (R. 456-58), find significant depression and pain disorder with associated psychological features.  These diagnoses began in November 2003 and continued through November 2005 – a period of two years in duration.

In addition to meeting the first part of the listing, Plaintiff must also demonstrate that she meets a second prong – the "B" criteria which provides as follows:

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration,
persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended
duration . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1.

Plaintiff's medical records do not demonstrate that she was "marked[ly]

restrict[ed] of activities of daily living."  While her testimony at the hearing before

the ALJ indicates to the contrary, the histories given by her examining doctors

indicate no such marked restrictions.  Dr. Baker found that, although her

diagnosis was of a "major depressive disorder, single episode, moderate," her level

of daily functioning allowed her to do the normal activities of cleaning, dishes,

laundry, and cooking for herself.  (R. 258, 261).  The Moskos/Dr. Gray

examination of February 2004 found that Plaintiff was having difficulty putting

sheets on a bed, putting a car in gear, or holding plates and opening jars because

of pain in her hands, but there is no indication that her mental health condition

was impairing her ability to perform activities of daily living.  (R. 276).  The

"probable duration" of Plaintiff's impairment was "1 to 3 months."  (R. 277).  Dr.

Gray's later (November 2005) examination found a GAF score of 60, and found:

"By the patient['s] report it appears her depression is related to the chronic pain

she is experiencing from the fibromyalgia.  She denies ever having mood problems

prior to the onset of her most prominent health care issue.  It is for that reason

that I would proceed with the diagnosis of Pain Disorder with medical condition

and associated psychological factors."  (R. 457).

Therefore, none of the three mental health reports indicate that, based on depression or other mental health conditions brought on by obesity, Plaintiff experienced "marked restriction of activities of daily living."

Neither does the record reflect any evidence of marked difficulties in maintaining social functioning, or reported episodes of decompensation, each of extended duration. This being the case, there is no medical evidence to establish that Plaintiff's conditions meet the B criteria of Listing 12.04.

### D. Conclusion as to Whether the ALJ Erred in the Evaluation of Plaintiff's Obesity

The ALJ in this case did make an explicit finding that Plaintiff's obesity was a severe impairment at Step 2, and we can trace the path of the ALJ's reasoning at Step 3 that Plaintiff's obesity did not meet or equal Listings 1.02, 1.04, or 12.04. Therefore, so long as the ALJ considered obesity in the RFC calculations, no error exists in the record to this point. Discussion of the ALJ's decision as to RFC follows, so it will not be addressed at this point in the court's opinion.

### Issue 3: Whether the ALJ failed to properly consider Plaintiff's fibromyalgia diagnosis.

In this case, the ALJ found that Plaintiff suffers from the severe impairment of fibromyalgia. (R. 24). This is not, therefore, a case where a claimant alleges that she suffers from the condition, but the ALJ concluded that the claimant does not. Rather, having concluded that the diagnosis of fibromyalgia was proper, (that is, certain trigger points seem to elicit pain response) and that Plaintiff's fibromyalgia was severe, the ALJ must then articulate how that diagnosis is to be

evaluated throughout the balance of the sequential evaluation process.  The court

finds illuminating the analysis of fibromyalgia by U.S. District Judge David

Hamilton which explains that:

> [f]ibromyalgia is a rheumatic disease characterized by symptoms of "pain all over," fatigue, disturbed sleep, stiffness, and multiple tender pressure points on the body.  There is no agency listing specific to fibromyalgia.  The regulations provide that, if an impairment is not listed, the agency will consider the listed impairment most like the claimant's impairment to decide whether the impairment is medically equivalent.

*Shinabarger v. Barnhart,* 2006 WL 3206338 at *10 (S.D.Ind. 2006)(citations

omitted).

As was the case in *Shinabarger,*

> The parties have not cited and the court has not located any case law or other authority discussing the proper listing for evaluating fibromyalgia.  Fibromyalgia is often diagnosed only after ruling out "other medical conditions which may manifest fibrosis-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Green-Younger v. Barnhart,* 335 F.3d 99, 109 (2nd Cir. 2003), quoting *Preston v. Secretary of Health and Human Services,* 854 F.2d 815, 819 (6th Cir. 1988); see also *Johnson v. Bowen,* 675 F.Supp. 1137, 1141-42 (N.D.Ind. 1987) (reviewing ALJ's step-three finding of medical equivalence for claimant's fibromyalgia and fibromyositis under Listing 1.02).  Listing 1.02 and Listing 14.09 are closely related:  Listing 14.00B6, which supplements Listing 14.09, states: "When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02...."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00B6.

*Id.*

In this case, the ALJ does not articulate whether or not she compared

Plaintiff's fibromyalgia condition to any specific listing.  Based on the case law

cited above, it appears that the ALJ should have considered whether Plaintiff's

fibromyalgia meets Listing 1.02. However, as described in Issue 2 above, none of the medical evidence (except Dr. Johnson) seems to show that Plaintiff's fibromyalgia condition causes functional impairments equivalent to Listing 1.02. As previously discussed, the ALJ did articulate why she did not give controlling weight to Dr. Johnson's opinions, and this is substantial evidence to support the conclusion that Plaintiff's fibromyalgia does not meet or equal Listing 1.02.

While it certainly would have been preferable for the ALJ to evaluate more clearly whether she compared Plaintiff's fibromyalgia to Listing 1.02 or other specific listings, her failure to do so is not reversible error in this case as we can trace the path of the ALJ's reasoning that Listing 1.02 was not met or equaled in this case.

**Issue 4:      Whether the ALJ neglected testimony concerning Plaintiff's vision, crying spells, and inability to drive.**

Plaintiff also argues that the ALJ disregarded some of her testimony at the hearing – specifically her vision difficulties, crying spells, and inability to drive. The court believes that this testimony is best addressed as a part of the ALJ's credibility assessment, and will be discussed below.

**Issue 5:      Whether the ALJ's credibility determination concerning the effects of Plaintiff's pain was patently wrong.**

Plaintiff also found fault with what she characterizes as the ALJ's credibility determination. An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, here the ALJ's "credibility" decision is more properly an evaluation of Plaintiff's

complaints of pain. Thereafter, the ALJ must not only consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, but also 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).

These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

Social Security Ruling 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ provided the following rationale for determining that Plaintiff was not credible:

> The claimant testified she has severe debilitating pain that prevents her from doing normal everyday things, taking care of herself or even sleeping. She stated that sometimes medication helps the pain and at other times it does not help at all. She indicated her day is spent primarily watching television and napping. The undersigned finds the claimant's testimony is not credible. The claimant may well have extremely limited activities of daily living but this is a matter of a lifestyle choice on the part of the claimant. The objective medical evidence of record including radiographs and doctors['] reports (made for the purposes of treatment) does not support her complaints of debilitating pain.

(R. 23). This rationale is inconsistent with the requirements of SSR 96-7p and 20 C.F.R. § 404.1529(c)(3)(i)-(vii). First, the court notes that Plaintiff was diagnosed with fibromyalgia, which does not manifest itself in ways that give rise to the types of "objective medical tests" that the ALJ found lacking. The Seventh Circuit has warned that the analysis of a pain disorder such as fibromyalgia often must center around the subjective complaints of the plaintiff, as there are few objective indicators. *See Sarchet v. Chater,* 78 F.3d 305, 306-07 (7th Cir. 1996). Second, the ALJ failed to address whether Plaintiff's testimony was credible given the litany of medications she was taking. Third, the ALJ failed to discuss why Plaintiff's complaints of pain were not credible given Dr. Gray's diagnosis of a psychological component to her pain. (R. 456-58). Fourth, and finally, the ALJ did not discuss why Plaintiff's headaches, which have lead to numerous hospitalizations, could not have lead to the type of debilitating pain that Plaintiff alleges. The key issue in this case – given the nature of Plaintiff's various

conditions – is the functional limitations which might be impaired by pain.  While the ALJ was faced with a daunting task in this case, this court cannot conclude that a full analysis of Plaintiff's pain was completed in this case.  On remand, the ALJ must follow SSR 96-7p and 20 C.F.R. § 404.1529(c)(3)(i)-(vii) concerning credibility and pain, and must discuss why, even given Plaintiff's headaches, her diagnosis of fibromyalgia, the psychological component to her pain, and her use of numerous medications, Plaintiff 's complaints of pain are not credible and do not substantially limit her functioning.

**Issue 6:      Whether the ALJ failed to consider the combined effects of Plaintiff's impairments.**

Next, Plaintiff claims that the ALJ failed to consider the combination of Plaintiff's impairments.  20 C.F.R. § 404.1523 provides that an ALJ must consider the combined effects of all impairments.  In this case, the ALJ was required to consider the combined effects of all of Plaintiff's impairments (severe or not) which would include the combined effects of fibromyalgia, obesity, degenerative disc disease, as well as:  (1) headaches (either migraine or resulting from meningitis) that were unusually frequent and often resulted in hospital visits; (2) vision problems resulting from atrophy of her iris; (3) sleepiness from sleep apnea and/or Plaintiff's medications; (4) some limitation of use of her left shoulder from rotator cuff tendinitis which required injections from time to time; (5) some limitation of use of her hands which, while not sufficient to meet a listing, resulted in a lifting limitation of five pounds (R. 454); (6) mental conditions – primarily depression – which were serious enough on two occasions

to cause Plaintiff to be evaluated with GAF scores of 50; and (7) Plaintiff's occasional bouts with kidney stones.

While the ALJ in this case has generally made a good effort in the evaluation, this court's review of the opinion does not find any specific discussion of the combined effects of all of Plaintiff's conditions. In reviewing these opinions, the court can often understand by examining the RFC assessment that an ALJ has considered the combined effects of an individual's conditions. In Plaintiff's case, the ALJ's RFC assessment determined that Plaintiff can perform light work with a sit/stand option; only occasional climbing of stairs; no climbing of ladders, ropes, or scaffolds, and no work around unprotected heights or dangerous machinery. (R. 24). This is a relatively modest reduction of Plaintiff's functional capacity, and it does not seem to explicitly discuss limitations arising from some amount of pain that Plaintiff would be subjected to as a result of her fibromyalgia. In light of the need to review for a more explicit evaluation of pain, the ALJ, on remand, should also articulate how the residual functional capacity may be impacted when all of Plaintiff's severe and non-severe pain-related conditions are considered.

**Issue 7:     Whether the ALJ failed to give proper weight to the opinions of Dr. Tretter.**

Plaintiff also argues that the ALJ improperly discounted the opinions of Dr. Tretter. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's

exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1177-78 (7th Cir. 2001). Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f) Opinions of nonexamining sources. We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1) In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

In this case, Dr. Tretter found in March 2004 that Plaintiff had a functional limitation on her hand activity, particularly with fine motor skills (R. 281), and in November 2005, that Plaintiff was unable to perform activities requiring repetitive use of her hands (R. 454). Dr. Tretter had noted in March 2004 that Plaintiff had swelling of the small joints in her hands and a limited range of motion. (R. 282-83). These findings were supported by the findings of several other doctors. In October 2004, Dr. Norton noted Plaintiff's right hand was diffusely "puffy" with tenderness of the finger joints. (R. 324). Dr. Gruber also noted that Plaintiff had complaints of pain in her hands. (R. 183). In November 2005, Dr. Johnson found severely decreased grip strength in both hands. (R. 474). Dr. Johnson opined that Plaintiff's pushing and pulling was limited, fingering and fine finger manipulation was decreased, and gross handling and manipulation was also decreased. (R. 476).

Despite these findings, the ALJ found that Dr. Tretter's opinion was not credible. (R. 23). The ALJ's decision is not supported by substantial evidence. There does seem to be ample medical evidence demonstrating that Plaintiff has significant limitations in the use of her hands both because of pain and because of functional limitations. While the ALJ may articulate that there are reasons why the treating physician's testimony need not be given controlling weight, the ALJ must do so complying with 20 C.F.R. § 404.1527 in analyzing these medical opinions.

**Issue 8: Whether Plaintiff could perform her past relevant work.**

Finally, the court notes that the ALJ made a specific finding that Plaintiff's RFC included avoidance of any dangerous machinery. Plaintiff clearly provided testimony at her hearing that part of her job working at the deli involved operating meat slicers and operating deep fryers for doughnuts. (R. 563). On remand, the ALJ must address whether Plaintiff's past work as a "deli worker" required her to be exposed to "dangerous machinery."

## VII. Conclusion

In taking on a difficult task of evaluating Plaintiff's conditions, the ALJ has conducted a proper evaluation in many respects. The key issue in this case is an evaluation of Plaintiff's pain and other non-exertional impairments brought on by depression, sleep apnea, a fibromyalgia diagnosis, degenerative disc disease, and obesity. This court believes remand is necessary to more clearly evaluate pain in accordance with SSR 96-7p. On remand, the ALJ must consider the combined effects of all of Plaintiff's impairments – physical and mental. Discussion of Dr. Tretter's analysis of Plaintiff's limitations on use of her hands is also warranted. And, the ALJ must evaluate whether Plaintiff can perform her past work as a deli worker. The decision to remand in this case does not, of course, indicate that Plaintiff will be ultimately found to be entitled to benefits.

The final decision of the Commissioner is, therefore, **REMANDED** for further proceedings consistent with this opinion.

**SO ORDERED** the 18th day of March, 2009.

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com